

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

01/10/2022

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ZACHRY SHYLER RIGGLE** | § | Case No. 19-43102 |
| | § | |
| | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| MIT FEDERAL CREDIT UNION | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 20-04029 |
| | § | |
| ZACHRY SHYLER RIGGLE | § | |
| | § | |
| Defendants | § | |

## <u>MEMORANDUM OF DECISION</u>

Before the Court for consideration is the "Motion for Summary Judgment" (the

"Motion") filed by the Plaintiff, MIT Federal Credit Union (the "Plaintiff" or "MIT"),

and the related objections and replies filed in the above-referenced adversary proceeding.

In the Motion and its "Complaint to Determine Dischargeability of Debt Pursuant to 11

U.S.C. § 523(a)(8)" (the "Complaint"), Plaintiff seeks a finding of nondischargeability of

a student loan debt owed by the Defendant, Zachry Shyler Riggle (the "Defendant" or

"Debtor") on the basis that excepting this student loan from discharge does not impose an

undue hardship on Defendant.  After consideration of the Motion, the related objections

and replies, the proper summary judgment evidence submitted by the parties, and the

relevant legal authorities, the Court concludes that genuine issues of material fact remain.

For the following reasons stated in this Memorandum Opinion, the Plaintiff's Motion

should be DENIED.

## I. Jurisdiction

The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334 and 157.

The Court has the authority to enter a final judgment in this adversary proceeding because

it constitutes a statutorily core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (I), and

(J), and meets all constitutional standards for the proper exercise of full judicial power by

this Court.

## II. Procedural Background

On November 14, 2019, Defendant initiated the main bankruptcy case associated

with this adversary proceeding (the "Case") by filing his voluntary petition for Chapter 7

relief under Title 11 of the United States Code (the "Bankruptcy Code"). On February

14, 2020, MIT filed its Complaint, initiating this adversary proceeding.[1]

On March 26, 2020, Defendant filed his "Answer to Complaint" (the "Answer"),

asking the Court to deny Plaintiff's requested relief.[2] After MIT filed the Motion on

October 29, 2020, Defendant filed his "Response in Opposition to Plaintiff's Motion for

---

[1] Pl.'s Compl., ECF No. 1.

[2] Def.'s Answer, ECF No. 6.

Summary Judgment" (the "Response") on December 4, 2020.[3]  MIT filed a "Reply Brief in Support of its Motion for Summary Judgment" (the "Reply Brief") on December 18, 2020.  On the same day, the Defendant filed an affidavit (the "First Affidavit") in support of his Response.  On December 28, 2020, MIT filed an "Objection to Affidavit of Zachry Shyler Riggle in Support of Defendant's Response and Motion to Strike" (the "Objection").  In the Objection, Plaintiff argued that the First Affidavit should be stricken from the record because "this Court does not permit hearings on motions for summary judgment."[4]  MIT further argued that the First Affidavit constituted an untimely filed sur-reply.[5]  Defendant responded on January 19, 2021 by filing a "Motion for Leave to Amend Response and File Affidavit in Support of His Response in Opposition to Plaintiff's Motion for Summary Judgment" (the "Motion for Leave to Amend"), and a "Response to Objection to Affidavit" (the "Objection Response").  In the Motion for Leave to Amend, Defendant sought to amend the Response to include new documents from the Department of Veteran Affairs (the "VA"), and to object to Plaintiff's alleged failure to authenticate documents attached to the Motion and attach the full transcript of Defendant's deposition.[6]  MIT responded on February 2, 2021, filing its "Plaintiff's Response in Opposition to Defendant's Motion for Leave" (the "Plaintiff's Response in

_____

[3] Def.'s Resp. Opp'n. Pl.'s Mot. Summ. J., ECF No. 17.

[4] Pl.'s Obj., 3 ¶ 5, ECF No. 21.

[5] *Id*.

[6] Def.'s Mot. Leave Amend, 5-6 ¶¶ 18-19, ECF No. 22.

Opposition"). Plaintiff attached the entire deposition transcript, and sought leave to file the deposition excerpts with the proper certification in order to rectify Defendant's evidence objections in the Objection Response. Plaintiff further argued that the Court should deny Defendant's Motion for Leave to Amend. Defendant filed a "Reply to Plaintiff's Response in Opposition" on February 9, 2021, while Plaintiff filed its own "Motion for Leave to Amend Pleading" on February 16, 2021. Defendant filed an objection to that motion on March 2, 2021.

On August 6, 2021, the Court signed an "Order Granting in Part and Denying in Part Defendant's Motion for Leave to File Amended Response," providing Defendant the opportunity to file an amended or supplementary response to the Motion. That same day, the Court also signed an "Order Granting Plaintiff's Motion for Leave to File Amended Response," allowing Plaintiff to cure Defendant's evidence objections. Following those orders, Plaintiff filed its "Amended Exhibits and Unsworn Declaration in Support of its Motion for Summary Judgment" on August 19, 2021, while Defendant filed his "Amended Response in Opposition to Plaintiff's Motion for Summary Judgment" (the "Amended Response") on August 27, 2021. Plaintiff filed an "Amended Reply Brief in Support of its Motion for Summary Judgment" (the "Amended Reply Brief") on September 16, 2021.

### III. Factual Background[7]

Defendant is forty-two (42) years old, single, and currently resides with his

mother.[8]  Prior to living with her, Defendant served as an active-duty Marine officer for

over eleven (11) years in ground reconnaissance and as a special operations intelligence

officer.[9]  This service included deployments to Iraq and Afghanistan.[10]  Following this

time in the military, Defendant applied to the MIT Sloan School of Management.[11]  In

order to finance his degree, Defendant completed a "Student Application for

Membership" to open a savings account with the Plaintiff on or about January 25, 2013.[12]

Several days later, on or about January 31, 2013, the Defendant completed a "Loan

Application: Private Line of Credit," in which he sought to borrow $76,000.00.[13]

Defendant received a Masters in Business Administration (the "MBA") from the MIT

Sloan School of Management in June 2013.[14]

---

[7] The facts presented are those which stand uncontested between the parties and are present only as a general factual background to the legal claims addressed by the respective motions.  This section is not intended to resolve any disputed or contested facts by and among the parties.

[8] Def.'s Am. Resp. Opp'n. Pl.'s Mot. Summ. J., Ex. F, 1 ¶¶ 1-3, ECF No. 33.

[9] Def.'s Am. Resp. Opp'n. Pl.'s Mot. Summ. J., Ex. A, 4 ¶¶ 22-25, ECF No. 33.

[10] Pl.'s Am. Reply Br., Ex. 12, ECF No. 34.

[11] *Id*.

[12] Def.'s Am. Resp. Opp'n. Pl.'s Mot. Summ. J., Ex. F, 2 ¶ 6, ECF No. 33.

[13] *Id*. at ¶ 7.

[14] *Id*. at ¶ 8.

Toward the end of 2013, Defendant worked as a consultant for a veteran nonprofit called Warrior Gateway.[15] He deferred his salary to help the organization meet "certain fundraising goals."[16] Defendant left that job, however, because the "executive director of the organization was pocketing money."[17] Following his position at Warrior Gateway, Defendant "self-funded" a move to San Francisco, living there from "January 2014 through May 2014."[18] Defendant expected his job in San Francisco to be his "first paying job, but it didn't pay."[19] When he realized the job "wasn't going anywhere," he returned to Boston.[20] Defendant "worked as a research scientist at MIT" upon that return to Boston.[21] He worked there until approximately December 2014, then joined a start-up called Northstar Performance in January 2015.[22] Defendant worked at Northstar Performance for approximately three (3) months, until May 2015.[23] Defendant found that the CEO was "embezzling funds" from the company, so Defendant "helped the Feds

---

[15] Pl.'s Am. Reply Br., Ex. 13, 7 ¶¶ 11-20, ECF No. 34.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 7 ¶¶ 22-25.

[19] *Id.*

[20] Pl.'s Am. Reply Br., Ex. 13, 8 ¶¶ 1-3, ECF No. 34.

[21] *Id.*

[22] *Id.* at ¶¶ 11-14.

[23] *Id.* at ¶¶ 17-18.

build a case against [the CEO]."[24]  Defendant received approximately $2,000.00 during

his time with Northstar Performance, and was not paid monthly.[25]

 After this experience, Defendant again moved back to Boston, where he taught

"intermittently" for a company called Fullbridge on a contract basis.[26]  His contract rate

was approximately $1,000.00 per day.[27]  He made somewhere between $30,000.00 and

$40,000.00 for the year from that contract position.[28]  During the time he was not working

for Fulbridge, Defendant worked for a company called F3EA, which had a contract with

the U.S. Military.[29]  In that position, Defendant "would go back and evaluate special

operations teams before they would deploy."[30]  It was also a contract position, for which

Defendant was paid approximately $500.00 per day.[31]

 In 2016, Defendant "took a job in New York City for a Company called Veracity

Worldwide," an "[e]merging market deal advisory."[32]  Defendant's annual salary for 2016

---

[24] *Id*. at 8 ¶¶ 18-23.

[25] Pl.'s Am. Reply Br., Ex. 13, 9 ¶¶ 11-13, ECF No. 34.

[26] *Id*. at 11 ¶¶ 12-15.

[27] *Id*. at 12 ¶¶ 3-5.

[28] *Id*. at ¶ 15.

[29] *Id*. at 13 ¶¶ 1-7.

[30] Pl.'s Am. Reply Br., Ex. 13, 12 ¶¶ 22-24, ECF No. 34.

[31] *Id*. at 13 ¶¶ 9-11.

[32] *Id*. at ¶¶ 13-16.

was $133,000.00.[33]  Defendant worked at Veracity Worldwide through June 2017.[34]

Defendant left Veracity Worldwide "amicably" with the intention to move "to one of the

larger competing firms."[35]  Defendant, however, could not find such employment, and did

not work for eleven (11) months following his time at Veracity Worldwide.[36]  Defendant

was next hired in April 2018 by a company called Blue Rocket, a "tech consultancy start-

up based out of Seattle."[37]  He worked on building the "internal processes of the

company," and training clients in "leadership and communication..."[38]  Defendant was

compensated approximately $10,000.00 per month.[39]  Defendant left Blue Rocket in

December 2018 in order to enter mental health treatment.[40]  He believed that his work

performance started to deteriorate in 2017, such that he "could no longer do simple tasks,

chart, organize, analyze," tasks in which he needed to be competent.[41]  Because he could

not complete these tasks, Defendant was "no longer functional at work."[42]  Defendant

---

[33] *Id*. at ¶ 19.

[34] *Id*. at ¶¶ 21-22.

[35] Pl.'s Am. Reply Br., Ex. 13, 14 ¶¶ 8-9, ECF No. 34.

[36] *Id*. at ¶ 17.

[37] *Id*. at 15 ¶¶ 2-7.

[38] *Id*. at ¶¶ 8-11.

[39] *Id*. at ¶ 13.

[40] Pl.'s Am. Reply Br., Ex. 13, 16 ¶¶ 3-9, ECF No. 34.

[41] *Id*. at 15 ¶¶ 20-25.

[42] *Id*.

spent the "majority of 2019 in or around mental health treatment centers," finishing treatment in July and moving "from New York back to Dallas."[43]  Defendant moved to Texas to assist his mother, who was "falling apart" after the loss of his brother in a car crash.[44]

Following his graduation from MIT, Defendant made monthly payments towards his student loan debt until June 25, 2019.[45]  From June 30, 2019 until December 29, 2019, Defendant's loan was in forbearance, which was extended from December 30, 2019 until April 29, 2020.[46]  On or about November 14, 2019, Defendant filed a voluntary petition for bankruptcy under Chapter 7.  In January 2020, Defendant accepted a position at a local gym called the Adaptive Training Foundation.[47]  His annual salary was approximately $80,000.00.[48]  The gym temporarily closed due to the COVID-19 pandemic.[49]  When the gym reopened, Defendant was asked not to return to work due to performance issues.[50]

---

[43] *Id*. at 16 ¶¶ 9-11.

[44] Pl.'s Am. Reply Br., Ex. 10, 24 ¶¶ 22-25, ECF No. 34.

[45] Pl.'s Am. Reply Br., Ex. 16, ECF No. 34.

[46] Pl.'s Am. Reply Br., Ex. 17, 2, ECF No. 34.

[47] Pl.'s Am. Reply Br., Ex. 11, 17 ¶¶ 12-16, ECF No. 34.

[48] *Id*.

[49] Def.'s Am. Resp. Opp'n. Pl.'s Mot. Summ. J., Ex. F, 3 ¶ 16, ECF No. 33.

[50] *Id*.

On August 22, 2019, the VA received a form concerning Defendant's intent to file a claim for benefits.[51]  The VA released its first rating decision concerning Defendant's benefits on May 29, 2020.[52]  On August 14, 2020, the VA received a second claim for benefits from Defendant, as well as an application for increased compensation based on unemployability.[53]  On September 21, 2020, the VA released a new rating decision concerning Defendant's service-related disability.[54]

Based on the letter from September 21, 2020, the VA decided to: (1) continue to evaluate Defendant's post-traumatic stress disorder as 70% disabling; (2) grant Defendant entitlement to individual unemployability effective May 1, 2020; (3) establish basic eligibility to Dependents' Educational Assistance effective May 1, 2020; and (4) deny entitlement to temporary total disability.[55]  The VA explained that it continued to evaluate Defendant's post-traumatic stress disorder as 70% disabling because the "service-connected condition [had not] increased in severity to warrant a higher evaluation."[56]  The VA listed reasons for the 70% evaluation, including but not limited to the following: "(1) forgetting names; (2) unprovoked irritability with periods of violence; (3) occupational

---

[51] Def.'s Am. Resp. Opp'n. Pl.'s Mot. Summ. J., Ex. A., 2, ECF No. 33-1.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.* at 1.

[56] Def.'s Am. Resp. Opp'n. Pl.'s Mot. Summ. J., Ex. A., 2, ECF No. 33-1.

and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking or mood."[57]  The VA granted the entitlement to individual unemployability because Defendant was "unable to secure or follow a substantially gainful occupation as a result of service-connected post-traumatic stress disorder. (38 CFR 4.16)."[58]  The VA further granted Defendant eligibility to Dependents' Educational Assistance because the evidence showed that Defendant had a "total service-connected disability, permanent in nature. (38 USC Chapter 35, 38 CFR 3.807)."[59]  Defendant was denied entitlement to temporary total disability because the evidence did not show that Defendant had a "service-connected condition that required "hospitalization" for a period of more than 21 days."[60]

On December 30, 2020, Navient, the servicer of Defendant's federal student loans, discharged his Federal Family Education Loan Programs (the "FFELP") loans and/or Federal Direct Loan Program loans "due to [his] Total and Permanent Disability" rating "based on documentation from the U.S. Department of Veteran Affairs."[61]

### IV. Summary Judgment Standard

A court may grant summary judgment "if the pleadings, depositions, answers to

---

[57] *Id.*

[58] *Id.* at 3.

[59] *Id.* at 4.

[60] *Id.*

[61] Def.'s Am. Resp. Opp'n. Pl.'s Mot. Summ. J., Ex. C., ECF No. 33-3.

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

(quoting Fed. R. Civ. P. 56(c)).  Fed. R. Bankr. P. 7056 incorporates Fed. R. Civ. P. 56 so

as to apply to adversary proceedings.  Thus, if summary judgment is appropriate, the

Court may resolve the case as a matter of law.

The moving party always bears the initial responsibility to inform the court of the

basis for its motion and to produce evidence which it believes demonstrates the absence

of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The manner in which the

necessary summary judgment showing can be made depends upon which party will bear

the burden of proof at trial.  *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1077 n.16 (5th

Cir. 1994).

In an 11 U.S.C. § 523(a)(8) case such as this, the burden of proof is split between

the debtor and creditor.  *Tollison v.Suntech, Inc. (In re Tollison)*, 305 B.R. 656, 659

(Bankr. N.D. Miss. 2004).  As the creditor, MIT has the burden to establish the existence

of a debt of the type within the categories contained in 11 U.S.C. § 523(a)(8).  *See*

*Tollison*, 305 B.R. at 659; *see also Corletta v. Tex. Higher Educ. Coordinating Board (In*

*re Pappas)*, 517 B.R. 708, 717 (Bankr. W.D. Tex. 2014), aff'd sub nom. *Corletta v. Tex.*

*Higher Educ. Coordinating Board.*, 531 B.R. 647, 654 (W.D. Tex. 2015).  Once the

creditor meets this burden at trial, "the debtor [non-movant] must then prove that

excepting the debt from discharge will impose an undue hardship." *Tollison*, 305 B.R. at 659. In a summary judgment context, the creditor must demonstrate that debtor will be unable to prove an undue hardship claim at trial. *Id.*

Therefore, in cases where the nonmovant "bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the nonmovant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A fact is material only if its resolution would affect the outcome of the action..." *Wiley v. State Farm Fire and Cas, Co.*, 585 F.3d 206, 210 (5th Cir. 2009). The nonmovant must evince more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the nonmoving party were to present these factual disputes at trial, they must be such that a rational fact finder might find in favor of the nonmoving party. *Id.* at 587. "All reasonable inferences must be viewed in the light most favorable" to the nonmoving party, and "any doubt must resolved in favor of the nonmoving party." *In re Louisiana Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017) (citing *Matsushita*, 475 U.S. at 586).

## V. *Brunner* Standard

Under 11 U.S.C. § 523(a)(8), "a loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a

governmental unit shall not be discharged unless excepting such debt from discharge

under this paragraph would impose an undue hardship on the debtor and the debtor's

dependents..."  There is no exact definition for the term "undue hardship" in the

Bankruptcy Code, and one has not been endorsed by the United States Supreme Court.

The Fifth Circuit has adopted the Second Circuit's three-prong *Brunner* test for

evaluating undue hardship claims.  *U.S. Dep't of Educ. v. Gerhardt (In re Gerhardt)*, 348

F.3d 89, 91 (5th Cir. 2003) (citing *Brunner v. N.Y. State Higher Educ. Services Corp.*,

831 F.2d 395, 396 (2nd Cir. 1987)).  In order to satisfy the test and receive a student loan

discharge, a debtor must demonstrate by a preponderance of evidence, that:

> (1) the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loan;

> (2) additional circumstances exist indicating that the debtor's current state of affairs is likely to persist for a significant portion of the repayment period of the student loan(s); and

> (3) the debtor has made good faith efforts to repay the loan.

*Id*. at 396.  If the debtor is unable to prove even one of the prongs, he does not meet the

standard for undue hardship.

*A. Minimal Standard of Living*

Under the first element of the *Brunner* test, a debtor must show that he cannot

maintain, based on current income and expenses, a "minimal standard of living" for

himself and his dependents if he is forced to repay the student loan.  *Id*.  Although there is

no uniform definition for "minimal standard of living," many courts "require more than

temporary financial adversity and typically stop short of utter hopelessness."[62]

This Court has used a two-step analysis when considering a debtor's minimal

standard of living: "(1) the evaluation of the debtor's present standard of living based

upon her lifestyle attributes which appear from the record; and (2) whether the forced

repayment of the student loan obligation will preclude the debtor from maintaining a

minimal standard of living." *Williams v. Tex. Guaranteed Student Loan Corp. (In re*

*Williams)*, No. 15-41814, 2017 WL 230349, at *6 (Bankr. E.D. Tex. May 25, 2017)

(citing *Naranjo v. Educ. Credit Mgmt. Corp. (In re Naranjo)*, 261 B.R. 248, 254-55

(Bankr. E.D. Cal. 2001)).  Overall, the first prong "requires the debtor to demonstrate that

he or she is attempting to minimize living expenses and maximize" income.  *Justice v.*

*Educ. Credit Mgmt. Corp. (In re Justice)*, No. 14-13684, 2016 WL 6956642, at *3

(Bankr. N.D. Miss. Nov. 28, 2016).

MIT has failed to prove there is no genuine issue of material fact concerning the

Defendant's minimal standard of living.  In the original "Brief in Support of Motion for

Summary Judgment" (the "Brief"), Plaintiff contends that the approximate monthly total

for the home mortgage and two utility bills, both in Defendant's mother's name, is

---

[62] *White v. Educ. Credit Mgmt. Corp. (In re White)*, No. 07-41509, 2008 WL 5272508, *at 5
(Bankr. E.D. Tex. Dec. 17, 2008) (quoting *Nary v. The Complete Source* (*In re Nary*), 253 B.R. 752, 761
(N.D. Tex. 2000)) (quoting *Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433,
437 (6th Cir. 1998)).

$1,811.55.[63]  Defendant, however, claims that because his "mother's medical issues have

affected her ability to work," Debtor's expenses are currently over $4,493.00 per month.[64]

These numbers are both different from MIT's alleged total of $1,255.00 for Defendant's

monthly expenses as stated in the Amended Reply Brief.[65]  When adding the $1,811.55 as

exhibited by the mortgage and utility statements, the total monthly expenses are actually

$3,066.55.  Plaintiff implies that the increased monthly VA entitlement equaling

$1,426.17 is sufficient to cover the $1,255.00 in monthly expenses as listed in

Defendant's Schedule J in the Case.[66]  The $1,426.17, however, does not cover the

additional $1,811.55 as shown by Plaintiff's own exhibits.  An accurate total for

Defendant's monthly expenses is necessary for the Court to determine Defendant's ability

to make monthly payments towards his student loan debt while maintaining a minimal

standard of living.  Thus, a genuine issue of material fact remains as to Debtor's current

household expenses.  Furthermore, the change in Defendant's monthly VA entitlements

since the commencement of this adversary proceeding presents a change in circumstance

that has also affected his net monthly income, which is material to the determination of

---

[63] Pl.'s Br. Mot. Summ. J., 7 ¶ 15, ECF No. 14.  A Wells Fargo Home Mortgage statement dated
May 15, 2020, shows the monthly mortgage payment to be $1,537.99.  Pl.'s Am. Reply. Br., Ex. 9, ECF
No. 34.  An electricity bill dated May 13, 2020 charged $195.56 for that billing period, while the total
charge on a utility bill dated April 30, 2020 was $78.00.  *Id.*  These three (3) expenses total $1,811.55.

[64] Def.'s Am. Resp. Pl.'s Mot. Summ. J., 12 ¶ 33, ECF No. 33.

[65] Pl.'s Am. Reply Br., 2 ¶ 1, ECF No. 34.

[66] *Id.*

the minimal standard of living prong.[67]

## B. Additional Circumstances

The second prong of the *Brunner* test is meant to be a "demanding requirement," and requires the debtor to demonstrate an inability to pay in the future for reasons outside the debtor's control which were not reasonably foreseeable. *U.S. Dep't of Educ. v. Gerhardt (In re Gerhardt)*, 348 F.3d 89, 92 (5th Cir. 2003) (citing *Brightful v. Pa. Higher Educ. Assistance Agency (In re Brightful)*, 267 F.3d 324 (3rd Cir. 2001)); *O'Donohoe v. Panhandle-Plains Higher Educ. Auth. (In re O'Donohoe)*, No. 12-33870, 2013 WL 2905275, at *4 (Bankr. S.D. Tex. 2013). In the Fifth Circuit, the standard under the second prong is "whether because of external factors, [the debtor's] present inability to pay [his] student loans and maintain a minimal standard of living will persist throughout a significant portion of the loan repayment period." *Thomas v. Dep't of Educ. (Matter of Thomas)*, 931 F.3d 449, 452 (5th Cir. 2019).

There are several outstanding genuine issues of material fact regarding the second prong of *Brunner* in this case. Both parties rely on the September 21, 2020 VA letter, but draw vastly different conclusions.[68] MIT argues that Defendant is still able to obtain and maintain at least lower-level employment, while Defendant states that his "disabilities affect his cognitive functioning and behavior in a way that extends to all types of

---

[67] *Id.*

[68] *See* Pl.'s Am. Reply Br., 4 ¶ 4, ECF No. 34.

employment..."[69]  Whether Defendant is able to both secure *and* maintain employment is

central to the analysis of the second *Brunner* prong.  Based on his purported job history, it

seems likely that Defendant will be able to *secure* such lower-level employment.  There

remains a genuine issue of material fact, however, as to whether Defendant can *maintain*

such employment.

Furthermore, there are issues of material fact concerning Defendant's "psychiatric

problems."[70]  While Plaintiff states that psychiatric illness "may" affect Defendant's

future employment prospects, it is possible for psychiatric illness to affect a debtor's

current state of affairs such that they will likely persist for a significant portion of the

repayment of the loan.  *See e.g. O'Donohoe v. Panhandle-Plains Higher Educ. Auth. (In

re O'Donohoe)*, No. 12-33870, 2013 WL 2905275, at *5 (Bankr. S.D. Tex. June 13,

2013) (finding intelligent, well-educated debtor with a long history of mental health and

medical disorders made it "difficult, if not impossible" to find employment).  When

viewing the evidence in the light most favorable to the nonmoving party, the VA's

determination of individual unemployability, and the Department of Education's

subsequent discharge of Defendant's federal student loans indicate that his psychiatric

illness may indeed "foreclose the Defendant's lifetime job prospects..."[71]  Thus, a genuine

---

[69] Def.'s Am. Resp. Opp'n. Pl.'s Mot. Summ. J., 13 ¶ 38, ECF No. 33.

[70] Pl.'s Am. Reply Br., 5 ¶ 5, ECF No. 34.

[71] *Id*.

issue of material fact remains as to the long-term effects of Defendant's post-traumatic stress disorder on his ability to work.

*C. Good Faith*

The third inquiry under the *Brunner* test is whether Debtor has made a good faith effort to repay the student loan. *Williams v. Tex. Guaranteed Student Loan Corp. (In re Williams)*, No. 15-41814, 2017 WL 230349, at *7 (Bankr. E.D. Tex. May 25, 2017). This Court has previously determined good faith by considering: "(1) the attempts by the debtor to maximize income through employment while minimizing expenses; and (2) the number of payments the debtor has made on the loan combined with any attempts by the debtor to negotiate forbearance, deferral, or an income-contingent repayment plan." *Williams*, 2017 WL 230349, at *7 (quoting *Gnahoua v. U.S. Dept. of Educ. (In re Gnahoua)*, 2016 WL 1238831, at *2 (Bankr. N.D. Tex. March 29, 2016)). Under this prong, courts have acknowledged that undue hardship "encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *White v. Educ. Credit Mgmt. Corp. (In re White)*, No. 07-41509, 2008 WL 5272508, at *6 (Bankr. E.D. Tex. Dec. 17, 2008) (quoting *Stein v. Bank of New England (In re Stein)*, 218 B.R. 281, 288 (Bankr. D. Conn. 1998)). A debtor's "efforts to utilize alternative means to address one's student loan obligation" is indicative of good faith. *Pratt v. Educ. Credit Mgmt. Corp. (In re Pratt)*, 375 B.R. 753, 763 (Bankr. S.D. Tex. 2007).

Plaintiff concedes that Defendant "made timely payments until June 25, 2019," and further acknowledges that Defendant received one (1) forbearance from June 30, 2019 until December 29, 2019, and another from December 30, 2019 until March 29, 2020.[72] MIT does not explicitly argue that Defendant displayed a lack of good faith in repayment of his student loans.[73] Plaintiff simply states that "[h]e has not paid since June 25, 2019."[74] MIT acknowledges, however, that Defendant sought and received a forbearance at least until March 29, 2020.[75] Courts have previously treated a debtor's forbearance(s) as indicative of good faith under the third prong of *Brunner*. *See Russ v. Tex. Guar. Student Loan Corp. (In re Russ)*, 365 B.R. 640, 646 (Bankr. N.D. Tex. 2007) (citing *McMullin v. United States Dep't. of Educ. (In re McMullin)*, 316 B.R. 70, 79 (Bankr. E.D. La. 2004)).  Defendant steadily made monthly payments for at least two (2) years.[76] He sought a forbearance when he was unemployed and it became evident he would be not be able to continue making those payments.  Thus, when viewing the facts in the light most favorable to the nonmovant, the Court finds that there is no genuine issue of material fact, and that Defendant exhibited good faith in his attempt to repay the loan.  Because the Court finds in favor of Defendant on this issue, it will not be re-

---

[72] Pl.'s Am. Reply Br., 6 ¶ 6, ECF No. 34.

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] Pl.'s Am. Reply Br., Ex. 16, ECF No. 34.

litigated at a trial on the merits.

## VI. Issues Precluded from Re-Litigation

For the aforementioned reasons, the Plaintiff's requested judgement in its favor as

a matter of law must be denied.  Nevertheless certain facts relevant to the issues before

the Court have been established in this proceeding under the guidelines of Local District

Court Rule CV-56, as incorporated by Local Rule of Bankruptcy Procedure 7056(d).[77]

These facts will not be re-litigated at the trial for this adversary proceeding.

1.    Defendant is forty-two (42) years old.[78]

2.    Defendant is single with no dependents, and lives with his mother in her home.[79]

3.    He served as an active-duty Marine officer for approximately eleven (11) years in
      ground reconnaissance intelligence and as a special operations intelligence

---

[77] Local District Court Rule CV-56 directs a movant to include a Statement of Undisputed
Material Facts and to support such a statement with "appropriate citations to proper summary judgment
evidence."  It directs a respondent that any response "should be supported by appropriate citations to
proper summary judgment evidence."  With regard to the disposition of the motion, the rule states:

> (c) **Ruling**.  In resolving the motion for summary judgment, the court will assume that the facts
> as claimed and supported by admissible evidence by the moving party are admitted to exist
> without controversy, except to the extent that such facts are controverted in the response filed in
> opposition to the motion, as supported by proper summary judgment evidence.  The court will
> not scour the record in an attempt to unearth an undesignated genuine issue of material fact.

Thus, any failure by a respondent to controvert the material facts set forth in any of the motions or to
support such a challenge by references to proper summary judgment evidence, results in the facts as
claimed and supported by admissible evidence by the movant "admitted to exist without controversy."
E.D. Tex. Local R. CV–56(c).

[78] While Plaintiff characterizes the Defendant as forty (40) years old, the Court takes judicial
notice that Defendant is currently forty-two (42) years old.  He was forty (40) years old at the time of
filing his voluntary petition.  Pl.'s Mot. Summ. J., 4 ¶ 15, ECF No. 13; Def.'s Am. Resp. Opp'n. Pl.'s
Mot. Summ. J., 5 ¶ 7, ECF No. 33.

[79] Pl.'s Mot. Summ. J., 4 ¶¶ 16-17, ECF No. 13.

officer.[80]

4.    This service included deployments to both Iraq and Afghanistan.[81]

5.    On or about January 2013, Defendant completed a "Student Application for Membership" to open a savings account with the MIT Federal Credit Union.[82]

6.    On or about January 31, 2013, Defendant completed a "Loan Application: Private Education Line of Credit" in which he requested the amount of $76,000.[83]

7.    On or about February 1, 2013, MIT Federal Credit Union opened an account in Defendant's name.[84]

8.    Defendant received an MBA from the MIT Sloan School of Management in 2013.[85]

9.    Following his graduation from MIT, Defendant worked at a nonprofit organization called Warrior Gateway.[86]  He deferred his salary for fundraising purposes.[87]

10.    Defendant left Warrior Gateway because the "executive director of the organization was pocketing money."[88]

11.    Defendant lived in San Francisco between January 2014 through May 2014.[89]

---

[80] Pl.'s Am. Reply Br., Ex. 12, ECF No. 34.

[81] *Id.*

[82] Pl.'s Mot. Summ. J., 3 ¶ 11, ECF No. 13.

[83] *Id.* at 4 ¶ 12.

[84] *Id.* at ¶ 13.

[85] *Id.* at ¶ 14.

[86] Pl.'s Am. Reply Br., Ex. 13, ECF No. 34.

[87] *Id.*

[88] *Id.*

[89] *Id.*

12.     Following the time in San Francisco, Defendant returned to live in Boston.[90]  He
        worked as a research scientist at MIT.[91]

13.     He was paid approximately $50.00 per hour, and worked approximately twenty
        (20) hours per week.[92]

14.     Defendant worked as a research scientist at MIT until December 2014.[93]

15.     In January 2015, Defendant accepted a position as the Chief Operating Officer (the
        "COO") for a start-up company called Northstar Performance in New York.[94]

16.     Approximately three (3) months after starting the position at Northstar
        Performance, Defendant discovered the Chief Executive Officer (the "CEO") was
        "embezzling funds."[95]  Defendant assisted "FBI investigators" in building a case
        against the CEO.[96]

17.     Throughout the duration of his employment with Northstar Performance,
        Defendant received approximately $2,000.00 in compensation.[97]

18.     Following his time at Northstar Performance, Defendant again returned to Boston
        and "looked for work" in 2015.[98]  He taught at a company called Fullbridge at a
        contract rate of approximately $1,000.00 per day.[99]

---

[90] *Id.*

[91] Pl.'s Am. Reply Br., Ex. 13, ECF No. 34.

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] Pl.'s Am. Reply Brief, Ex. 13, ECF No. 34.

[97] *Id.*

[98] *Id.*

[99] *Id.*

19.    During that time in Boston, Defendant was also employed on a contract basis for a company called F3EA.[100]  He evaluated special operations for the military for approximately $500.00 per day.[101]

20.    In 2016, Defendant moved to New York City to work for a company called Veracity Worldwide, an emerging market deal advisory.[102]

21.    Defendant's salary at Veracity Worldwide was approximately $133,000.00 for the first year.[103]  He worked there through June 2017.[104]

22.    After leaving Veracity Worldwide, Defendant did not secure employment for eleven (11) months.[105]

23.    In April 2018, Defendant was hired by a technology consulting start-up called Blue Rocket.[106]  His title was COO, and his compensation was $10,000.00 per month.[107]

24.    Defendant worked for Blue Rocket through December 2018.[108]

25.    Defendant left Blue Rocket when his performance started to deteriorate and he "could no longer do simple tasks."[109]  After leaving Blue Rocket, Defendant

---

[100] *Id.*

[101] Pl.'s Am. Reply Brief, Ex. 13, ECF No. 34.

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] Pl.'s Am. Reply Br., Ex. 13, ECF No. 34.

[107] *Id.*

[108] *Id.*

[109] *Id.*

entered mental health treatment.[110]

26.  Defendant spent the "majority of 2019 in or around mental health treatment centers..."[111]

27.  Defendant moved from New York to Texas in July 2019 after the mental health treatment to assist his mother following the loss of his brother in a car crash in November 2018.[112]

28.  On November 14, 2020, Defendant filed a voluntary petition for Chapter 7.[113]

29.  In January 2020, Defendant accepted a position at a local gym called the Adaptive Training Foundation.  His salary was set to be around $80,000.[114]

30.  Defendant's student loan debt was in forbearance from June 30, 2019 until December 29, 2019.[115]  This forbearance was extended from December 30, 2019 until April 29, 2020.[116]

## VII.  Conclusion

Based upon the Court's consideration of the pleadings, the summary judgment evidence submitted therewith, the relevant legal authorities, and for the reasons set forth herein, the Court concludes that the "Motion for Summary Judgment" filed by the Plaintiff, MIT Federal Credit Union, is hereby DENIED.  Plaintiff failed to demonstrate it

---

[110] *Id.*

[111] Pl.'s Am. Reply Br., Ex. 13, ECF No. 34.

[112] Pl.'s Am. Reply Br., Ex. 8, ECF No. 34; *see* Pl.'s Am. Exhibits, Ex. 8, ECF No. 32.

[113]  Pl.'s Mot. Summ. J., 3 ¶ 10, ECF No. 13.

[114] *Id.* at 4 ¶ 19.

[115] Pl.'s Am. Reply Br., Ex. 16, ECF No. 34.

[116] *Id.*

was entitled to a judgment as a matter of law regarding the dischargeability issue raised

under 11 U.S.C. § 523(a)(8) in the "Complaint to Determine Dischargeability of Debt

Pursuant to 11 U.S.C. § 523(a)(8)." Therefore, this claim must be determined through a

trial on the merits.

Numerous factual issues, however, have been established through the summary

judgment evidence tendered to the Court. Because the Court has not granted the relief

sought by the Plaintiff's "Motion for Summary Judgment," it is appropriate to state the

material facts that are not genuinely in dispute pursuant to Fed. R. Civ. P. 56(g). These

established facts as set forth in this memorandum shall not be re-litigated at the trial for

this adversary proceeding. An appropriate order consistent with this opinion shall be

entered by the Court.

Signed on 01/10/2022

THE HONORABLE JOSHUA P. SEARCY
UNITED STATES BANKRUPTCY JUDGE

-26-